## Mullany, etc., v. McDonald et al.

*N. E. Womer*, for plaintiff.

*L. D. McCall*, for defendants.

McKENRICK, J., forty-seventh judicial district, specially presiding, January 18, 1935.—H. J. Mullany, trading and doing business under the name and style of H. J. Mullany & Son, brought an action in assumpsit against William McDonald and W. C. Wolf to recover the price of chicken feed sold by plaintiff to defendants. The balance claimed by plaintiff was admitted and a verdict was, therefore, rendered in favor of the plaintiff in the sum of $628.12.

Defendants filed a counterclaim against plaintiff for damages alleged to have been sustained by them by reason of a breach of contract on the part of the plaintiff to deliver certain feed and the same jury returned a verdict on the counterclaim in favor of the defendants for the sum of $1,256.24. Plaintiff has filed a motion for a new trial and a motion for judgment n. o. v. There is no particular difficulty involved in that part of the case which related to the verdict which plaintiff obtained on his book account. The facts briefly are these:

Plaintiff was engaged in the business of selling feeds. Defendants operated a chicken farm and from time to time bought feed from plaintiff's establishment. Plaintiff, among other goods, distributed a prepared chicken ration which possessed certain qualities and virtues not inherent in other chicken feeds. The plaintiff not only sold this prepared chicken ration, but recommended it to those who were in the poultry business. He was not only the exclusive dealer in his own locality, but controlled the

distribution of this particular feed in the surrounding territory. Plaintiff knew that defendants had been using this special preparation exclusively, was familiar with the defendant's business, had seen their flocks on numerous occasions and knew the effect which a change of feed would have upon chickens, if that change was made arbitrarily. Plaintiff also knew that this particular preparation could not be bought from other dealers in the vicinity in which the defendants lived.

During a long course of dealing with the plaintiff, defendants became indebted to him in a considerable sum and, their credit not being satisfactory, they were notified that future sales must be on a cash basis.

On or about August 30, 1930, the supply of this special chicken feed was exhausted, and Wolf, one of the defendants, went to the plaintiff's store and ordered 2 tons of this special feed and tendered in payment of the cost thereof a check for $125, which check was good. It was stated to the clerk in charge of this store that the feed was needed that day. The clerk accepted the order and took the check and delivered to the defendant Wolf a part of the order, which Wolf took away with him; the balance of the 2-ton order was to be delivered to the defendants next day by the plaintiff, who customarily delivered the goods. The sale price included delivery charges. Both the order for the feed and the check to pay for same were turned over to the plaintiff by the employe who made the deal with Wolf. Notwithstanding that the feed was paid for and part of the order delivered, the plaintiff arbitrarily applied the check of $125 to the bill which defendants owed him for past purchases and did not deliver the balance of the 2-ton order. When defendants did not receive the feed they had bought and paid for they made inquiry of the plaintiff and learned from him that he did not intend to fill the order, but considered the check as payment on account. As a result of the failure of the plaintiff to deliver the feed and defendants' inability to secure the same kind of feed elsewhere,

the poultry of defendants moulted and ceased to lay. In order to prevent destruction of the flock and minimize their loss defendants were required to kill the chickens and sell them for meat.

There was ample evidence as to the condition of the flock before and after they had been deprived of their usual rations. There was considerable testimony by expert poultrymen concerning the results which occur when a chicken "goes off its feed". There was testimony that unless poultry accustomed to a certain type of prepared feed can be shifted gradually from one feed to another serious results occur.

Defendants took the position that if the plaintiff desired to repudiate the order for feed it was his duty to return the check given in payment therefor, and not appropriate it to his own use. It is further contended that plaintiff could not accept the part of the contract which was beneficial to him and reject the rest. The court was very careful to instruct the jury that if the order was given and accepted as a cash order, then the plaintiff could not repudiate the contract for delivery; nor could he accept the money and retain it for purposes other than that for which it was given. On the other hand, we instructed the jury that if the check was merely a payment on account of past indebtedness there was no obligation on the part of the plaintiff to furnish further merchandise merely because defendants were in a measure complying with plaintiff's demands to pay up. The jury found, and were amply warranted in finding, that the $125 check was given to pay for 2 tons of feed, which the plaintiff did not deliver.

The plaintiff complains that there was no satisfactory proof of agency on the part of the plaintiff's employe who made the contract, and, second, the evidence was not sufficient to warrant a recovery in damages under the facts in the case. We submitted very carefully, and we think correctly, the question of agency to the jury and, we believe, we correctly applied the law of damages.

There is no doubt in our mind, and the jury was entirely satisfied also, that the plaintiff knew all about the special feed that he was distributing to the defendants and other customers. He also knew that it would be dangerous to permit poultry to go without the feed to which they were accustomed and that another feed could not be substituted without dangerous results. A reading of the testimony would convince anyone that the plaintiff was not an innocent country merchant who merely passed on to his customers goods which were supposed to be good for poultry. It is idle to pretend that the plaintiff was ignorant of the effects his refusal to comply with the contract might entail. The evidence in this case is convincing.

The losses proved were not speculative, but were founded on testimony that is not only credible, but clear. The plaintiff must have known that defendants could not go into the open market and purchase the identical feed; the only market that was reasonably open was the market controlled or dominated by the plaintiff himself. We believe we submitted fairly and correctly to the jury every phase of the controversy and we are not convinced that our interpretation of the law was erroneous. The jury heard the witnesses and we think their verdict is sufficiently supported, not only by the testimony on the part of the defendants, but by the testimony given by the plaintiff's witnesses. Our impression at the time of the trial, although not indicated, is the impression we now hold—that plaintiff, as he admitted, "needed some money", and applied the $125 check on his old bill. He may have felt, and it is an impression only, that defendants, out of the necessities of their situation, would raise more money to apply on their account, or make other satisfactory arrangements to insure the delivery of the feed, and that would be the end of the trouble. Unwittingly, perhaps, but chargeable with the legal consequences, plaintiff plunged himself into the situation from which he is now endeavoring to escape. In our view of the testimony, the

verdict in favor of the defendants might have been much larger.

At the close of the charge, our recollection is that counsel for both parties were asked if there was anything that they desired the court to add, and both counsel expressed themselves as entirely satisfied with the charge.

We conclude, therefore, that the verdict on defendants' counterclaim was warranted by the law and the facts and we must, therefore, decline to grant either of plaintiff's motions.

### Decree

And now, January 18, 1935, the motion for a new trial and the motion for judgment n. o. v. are overruled and the prothonotary is directed to enter judgment on the verdict upon payment of the jury fee.

From John M. Urey, Clearfield.